UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

BLACK FARMERS AND
AGRICULTURISTS ASSOCIATION,
INC. AND THOMAS BURRELL                                    PLAINTIFFS

VS.                            CIVIL ACTION NO. 3:13CV763TSL-JMR

JIM HOOD, ATTORNEY GENERAL,
STATE OF MISSISSIPPI                                        DEFENDANT

MEMORANDUM OPINION AND ORDER

     This cause is before the court on the motion of defendant Jim
Hood, Attorney General, State of Mississippi, in his official
capacity, to dismiss pursuant to Rule 12(b)(1) or 12(b)(6) of the
Federal Rules of Civil Procedure.  Rather than respond to the
substance of the motion, plaintiffs Black Farmers and
Agriculturists Association, Inc. and its president, Thomas
Burrell,[1] filed a motion for leave to file a second amended
complaint which they contend "addresses all of the alleged
concerns and defects in the original Complaint (and First Amended
Complaint) as set forth in Defendant's Motion to Dismiss."  The
proposed second amended complaint further adds claims against
Attorney General Hood in his individual capacity, and includes
various federal and state law claims against numerous other

_____

     [1]   Although the style of the complaint identifies only
Black Farmers and Agriculturists, Inc. as a plaintiff, the body of
the complaint includes Thomas Burrell as a plaintiff.

defendants.  Both motions have been fully briefed and the court, having considered the parties' submissions on the motions, concludes, first, that Attorney General Hood's motion to dismiss the claims against him in his official capacity is well taken and should be granted.  The court further concludes that plaintiffs' motion to amend their complaint to cure deficiencies in the original complaint[2] and to add claims against Hood in his individual capacity should be denied for reasons set forth herein. The court further concurs in Hood's contention that since plaintiffs have no legitimate current, or proposed claims against Hood, then their motion to amend should be denied *in toto* as it does not make sense to transform plaintiffs' lawsuit, (which was brought initially against only Hood) into a new one against an entirely different group of dissimilarly situated defendants.

Background:[3]

In 1997 and 1998, two class-action lawsuits, <u>Pigford v. Glickman</u> and <u>Brewington v. Glickman</u> (collectively <u>Pigford I</u>), were

---

[2]   Plaintiffs filed their original complaint on December 5, 2013 and immediately filed a first amended complaint on December 6, 2013, which made no discernable substantive change to the original complaint.  References herein to the "complaint" or "original complaint" will be to the first amended complaint.

[3]   Background information is drawn from the allegations of plaintiffs' complaint, as well as from court records and the informational website for <u>In re Black Farmers Discrimination Litigation Settlement</u>, Case Number 08-mc-0511 (D.D.C.), also known as "the Black Farmers case" or "<u>Pigford II</u>." <u>www.blackfarmercase.com</u> (last accessed Mar. 10, 2013)

filed on behalf of groups of African-American farmers who asserted that the United States Department of Agriculture (USDA) had systematically discriminated against African-American farmers on the basis of race.  On April 14, 1999, following consolidation of the cases, the United States District Court for the District of Columbia entered a consent decree approving a settlement of the claims.  That consent decree established an October 12, 1999 deadline for the filing of eligible claims, and approximately 22,700 claims were filed by that date.  However, the consent decree further provided that claimants who failed to file by the October 12, 1999 deadline could obtain an extension until a "late-filing" deadline of September 15, 2000 upon a showing of "extraordinary circumstances".  Although approximately 61,000 individuals requested permission to file by this "late-filing" deadline, fewer than 3,000 of those individuals were found to have demonstrated the required "extraordinary circumstances".  Consequently, nearly 58,000 "late-filers" did not have their discrimination claims heard.

In June 2008, Congress passed the 2008 Farm Bill which gave African-American claimants a right to pursue their discrimination claims if they had petitioned to participate in Pigford I but did not have their petitions considered because they were filed late. While the 2008 Farm Bill created a cause of action for many thousands of black farmers, it capped funding for valid claims at

3

$100 million.  Approximately 40,000 claimants filed lawsuits under the 2008 Farm Bill, which suits were consolidated into a single case called In re Black Farmers Discrimination Litigation, 08-mc-0511 (D.D.C.), or Pigford II.  It was apparent in light of the large number of complainants that the existing funding of $100 million was inadequate.  Therefore, on February 18, 2010, the plaintiffs reached a settlement with the USDA and the Justice Department which required Congress to fund an additional $1.15 billion for successful claimants (which would bring total funding for valid claims to $1.25 billion).  In keeping with that settlement agreement, in the fall of 2010, Congress passed the Claims Resolution Act of 2010, which provided $1.15 billion (additional to the $100 million already provided in the 2008 Farm Bill) to fund the settlement agreement.  By order entered October 27, 2011, the court approved the settlement and thus resolved all of the claims in the consolidated lawsuits.  The order established a 180-day period for submitting claims under the settlement running from November 14, 2011 to May 11, 2012, and explicitly provided that claims postmarked after May 11, 2012 would not qualify for an award.

In addition to this litigation by black farmers, similar lawsuits were brought by Native American farmers and ranchers, see Keepseagle v. Vilsack, No. 1:99-cv-03119 (D.D.C. 1999); by Hispanic farmers and ranchers, see Garcia v. Vilsack, No. 1:00-cv-

4

2445 (D.D.C. 2000); and by female farmers and ranchers, <u>see</u> <u>Love</u>
<u>v. Vilsack</u>, No. 1:00-cv-2502 (D.D.C. 2000). In <u>Keepseagle</u>, which
was certified as a class action, a settlement was reached in April
2011 which made up to $760 million available to eligible claimants
who filed claims on or before a December 7, 2011 filing deadline.

Unlike <u>Pigford I/Pigford II</u> and <u>Keepseagle</u>, the court in the
<u>Love</u> and <u>Garcia</u> cases declined to certify those cases as class
actions. Ultimately, in response to the <u>Love</u> and <u>Garcia</u> lawsuits,
the USDA established a voluntary claims process to resolve
discrimination claims of Hispanic and female farmers and ranchers
as an alternative to litigation. The USDA made available up to
$1.33 billion for claimants who filed their claims by the May 1,
2013 filing deadline.

<u>Black Farmers and Agriculturists Association, Inc.</u>

According to the allegations of the complaint, Black Farmers
and Agriculturists Association, Inc. (BFAA) is a not-for-profit
advocacy association, whose membership consists mostly of socially
disadvantaged farmers, ranchers, landowners and the heirs,
administrators and assigns of farmers, ranchers and landowners,
and whose purpose is to "advocat[e] lawful ends and vindicat[e]
the rights of its members within the State of Mississippi and
elsewhere." More particularly, plaintiffs allege that BFAA "has
been helping it [sic] members who were denied in <u>Pigford I</u> and
<u>Pigford II</u> as well as its members who are actual and/or potential

claimants in the <u>Garcia</u> and <u>Love</u> settlements" by "traveling throughout the country holding meetings and workshops to acquaint and explain – particularly to the heirs and administrators of farmers and ranchers – some of the terms and questions necessary for them to better understand the claims process" and "helping them to prepared [sic] Affidavits summarizing, detailing and specifying their allegations of discrimination and calculating economic damages."  In this regard, BFAA alleges that while 18,000 of the 61,000 claimants in <u>Pigford II</u> were successful, the remaining 43,000 claimants were denied relief.  Plaintiffs aver that many of these denied claimants are illiterate and/or were unfamiliar with the claims process and/or farming industry jargon and hence were unable to properly complete the required claim forms.  Plaintiffs allege that since many of the <u>Garcia</u> and <u>Love</u> claimants labor under similar burdens, their claims are likely to experience a similar fate to that visited upon so many of the <u>Pigford II</u> claimants.  Plaintiffs allege that their purpose in conducting the meetings and/or workshops is to reach these individuals who were either denied relief in <u>Pigford II</u> or who desire plaintiffs' assistance in becoming claimants in the <u>Love</u> and <u>Garcia</u> voluntary claims process and to provide them assistance in presenting their claims.  Plaintiffs allege that while BFAA charges a $100 fee for membership in the organization, BFAA charges no admission fee for its meetings and/or workshops and

does not require anyone to become a member of the organization as a basis for attending these meetings and/or workshops.

This Lawsuit

On December 5, 2013, plaintiffs filed the present action against Mississippi Attorney General Jim Hood, in his official capacity only, complaining about a press release issued by Hood on October 23, 2013, just one day after a BFAA meeting/workshop in Hattiesburg, Mississippi.  The press release stated the following:

> Jackson, MS-Attorney General Jim Hood is warning consumers to be aware of persons or organizations offering help in filing claims in the Black Farmers Discrimination Litigation involving the United States Department of Agriculture.
>
> "It has been brought to our attention that there are individuals/organizations who are holding meetings statewide and charging a fee to help black farmers file claims and participate in lawsuits when, in fact, the deadline to do so has long since passed," said Attorney General Hood.  "We are looking into these allegations and what we can do about them, but feel the need to warn consumers to be wary."
>
> The federal courts gave final approval to the settlement on October 27, 2011, providing over $1 billion to settle claims by African American farmers that the USDA discriminated against them between 1981 and 1996 based on race, wrongfully denying them farm loans, loan servicing, and other benefits, or giving them loans with unfair terms.  The deadline to file a claim for the settlement was May 11, 2012, more than one year ago.
>
> "Where there is money involved, we find scammers trying to steal it from those who most need it," said Attorney General Hood.  "What a shame that we have to send out such a warning.  You can never be too careful these days."
>
> If you feel you may have already fallen for such a scam, please contact the Attorney General's Office at

7

> 601-359-4230 or 1-800-281-4418.  You may also fill out
> and submit a complaint form online at www.agjimhood.com.

In their complaint, plaintiffs allege that the statements in this

press release were

> untrue, erroneous, overly broad, and misleading.  They
> suggest that the efforts of Plaintiff's organization are
> a scam (and/or without adequate merit or credit) when,
> in fact, Plaintiff's organization has merit and attempts
> to deal fairly on behalf of disadvantaged farmers.
> Approximately 43,000 people were denied in <u>Pigford II</u>
> and Plaintiff is advocating on their behalf so that they
> may be allowed to file further claims.  In addition,
> Rule 24 Motions to Intervene have been filed in the
> <u>Guadalupe Garcia</u> and <u>Love</u> cases.  Plaintiff seeks to
> obtain Temporary Restraining Orders to ask that the
> filing periods not be allowed to expire and that they be
> able to include disadvantaged farmers based on Equal
> Protection arguments.  It is not absolutely and finally
> determined, that the deadlines for filing have passed.
> In the alternative, even if this Court does consider
> that a deadline has passed, there is no foundation for
> the Attorney General to publicly suggest and claim that
> consumers should be aware of other efforts to help black
> farmers which are aimed at attempting to allow further
> relief through the legal process, and to raise arguments
> that deadlines should be extended.  In the alternative
> and in addition, the statements of Attorney General Jim
> Hood are sufficiently broad and effectively discredit
> Plaintiff's organization.  The statements have caused
> losses to Plaintiff.  In the alternative to the above
> and in addition, even if this Court finds that
> Defendant's statements do not rise to the level of
> defamation or slander, they nevertheless are
> sufficiently misleading and overly broad, effectively
> causing losses to and/or discrediting Plaintiff without
> sufficient basis, such that the Honorable Court should
> provide relief ....

On the basis of these allegations, plaintiffs asserted federal

claims for violation of the First Amendment, 42 U.S.C. § 1981 and

the Equal Protection Clause, and state law claims for negligence

and defamation, for all of which they demanded declaratory and

injunctive relief.  In particular, plaintiffs requested a declaration generally affirming their First Amendment rights and holding that the press release violated those rights, and an injunction ordering the Attorney General to correct the press release, and cease and desist from making any future further "detracting and/or defamatory and/or misleading and/or discrediting remarks concerning Plaintiff's activities and membership."

<u>The Motion to Dismiss</u>

Defendant Hood in his official capacity promptly moved for dismissal of plaintiffs' complaint on the basis of Eleventh Amendment immunity.  As noted in this motion, the Eleventh Amendment bars suits by private citizens against a state in federal court; and, since official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent," <u>Hafer v. Melo</u>, 502 U.S. 21, 25, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991) (internal quotations omitted) (quoting <u>Kentucky v. Graham</u>, 473 U.S. 159, 165, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)), that bar extends to suits against state actors sued in their official capacities, <u>K.P. v. LeBlanc</u>, 627 F.3d 115, 124 (5th Cir. 2010)(citing <u>Hutto v. Finney</u>, 437 U.S. 678, 700, 98 S. Ct. 2565, 57 L. Ed. 2d 522 (1978)); <u>McCarthy ex rel. Travis v. Hawkins</u>, 381 F.3d 407, 412 (5th Cir.

2004) (Eleventh Amendment "generally precludes actions against state officers in their official capacities").

In Ex parte Young, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908), the Supreme Court carved out a narrow exception to Eleventh Amendment immunity by permitting suits for prospective relief against state officials for violations of federal law by those officials.  Hood acknowledges this, but he maintains that plaintiffs' claims do not fit within the Ex parte Young exception. In the court's opinion, he is correct.

Under Ex parte Young, a plaintiff may avoid the Eleventh Amendment bar to suit and proceed against individual state officials in their official capacities so long as his complaint (a) "alleges an ongoing violation of federal law" and (b) "seeks relief properly characterized as prospective." Verizon Maryland, Inc. v. Public Serv. Comm'n of Md., 535 U.S. 635, 645, 122 S. Ct. 1753, 1760, 152 L. Ed. 2d 871 (2002).  See also Cantu Servs., Inc. v. Roberie, 535 Fed. App'x 342, 344–345 (5th Cir. 2013) (explaining that "to avoid an Eleventh Amendment bar by means of Ex parte Young, 'a court need only conduct straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'") (quoting Va. Office for Prot. & Advocacy v. Stewart, --- U.S. ----, 131 S. Ct. 1632, 1639, 179 L. Ed. 2d 675 (2011)); Neuwirth v. Louisiana State Bd. of Dentistry, 845 F.2d 553, 555 (5th Cir.

10

1988) (Ex parte Young exception "enables a federal court to entertain a suit for prospective relief against a defendant state officer upon allegations that he violated federal law, based on the legal fiction that a state officer cannot then be acting pursuant to state authority").

While plaintiffs herein do purport to seek prospective injunctive relief, i.e., an order enjoining Hood to "correct the press release" and to cease and desist from making any further "detracting and/or defamatory and/or misleading and/or discrediting remarks concerning Plaintiff's activities and membership," they have not alleged an ongoing violation of federal law.  The premise of Ex parte Young is that remedies designed to end a continuing violation of federal law vindicate the federal interest in assuring the supremacy of federal law.  See Pennhurst State School and Hosp. v. Halderman, 465 U.S. 89, 102, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984).  Thus the Court held in Ex parte Young that "relief that serves directly to bring an end to a present violation of federal law is not barred by the Eleventh Amendment."  Papasan v. Allain, 478 U.S. 265, 278, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986) (emphasis added).

> [Ex parte] Young has been focused on cases in which a
> violation of federal law by a state official is ongoing
> as opposed to cases in which federal law has been
> violated at one time or over a period of time in the
> past, as well as on cases in which the relief against
> the state official directly ends the violation of
> federal law as opposed to cases in which that relief is
> intended indirectly to encourage compliance with federal

law through deterrence or directly to meet third-party
interests such as compensation.  As we have noted:
"Remedies designed to end a continuing violation of
federal law are necessary to vindicate the federal
interest in assuring the supremacy of that law.  But
compensatory or deterrence interests are insufficient to
overcome the dictates of the Eleventh Amendment."

Id. at 277-78, 106 S. Ct. 2932.

In the case at bar, plaintiffs allege in their complaint that

they continue to suffer harm from a past act by Attorney General

Hood that allegedly violated their constitutional rights; but they

do not allege an *ongoing* violation of their constitutional rights.

Therefore, Ex parte Young provides no relief from the bar of the

Eleventh Amendment.  See Johnson v. Owens, No. 2:07-CV-0003, 2009

WL 667193, at *5 (N.D. Tex. Mar. 16, 2009) (holding that while the

effects to the plaintiff may have been ongoing, they flowed from a

past defective hearing which would not be repeated; and therefore,

the request for an injunction to correct those past deficiencies

was barred by Eleventh Amendment immunity); see also Cantu Servs.,

535 Fed. App'x. at 345 (holding that while complaint on its face

sought prospective relief as required under Ex parte Young, it did

not allege an ongoing federal law violation, i.e., that state law

officials were continuing to infringe a constitutionally protected

interest, and therefore there was "no ongoing violation of law

remediable by prospective relief under Ex parte Young").

12

The Motion to Amend

As stated, plaintiffs did not file a substantive response to Hood's motion to dismiss but rather filed a motion for leave to file a second amended complaint which they assert "addresses all of the alleged concerns and defects in the original Complaint (and First Amended Complaint) as set forth in Defendant's Motion to Dismiss." They further propose by their second amended complaint to add claims against Hood in his individual capacity, and to add various claims against numerous additional defendants, including the former president of BFAA and current president of the Black Farmers and Agriculturists Association, who is alleged to have defamed Burrell by falsely stating to the news media that Burrell is not the "legitimate" president of BFAA and that Burrell is scamming farmers and their heirs; an attorney for the plaintiff class in Pigford I and Pigford II, who is also alleged to have falsely stated to news media that Burrell was scamming black farmers; various news outlet/reporters who allegedly published defamatory reports concerning plaintiffs; the Alabama Attorney General, who allegedly issued warnings about BFAA's putative activities similar to those issued by Attorney General Hood; an Alabama congresswoman who is alleged to have issued similar warnings that BFAA was scamming people; the mayor of Hattiesburg, Mississippi, who is alleged to have made defamatory statements about BFAA and Burrell to the public; local law enforcement

13

officials in Hattiesburg, Mississippi and Dothan, Alabama, who allegedly interfered with meetings and/or workshops held by BFAA; and Regions Bank, which allegedly refused to honor a customer's check to BFAA.

Defendant Hood has responded in opposition to the motion to amend contending the motion should be denied on the basis of futility as the proposed amended complaint states no cognizable claim against him in either his official or individual capacities. The court, for reasons which follow, concludes that his position is well taken and that the motion to amend should therefore be denied.

Federal Rule of Civil Procedure 15 provides that leave to amend should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). A motion to amend ordinarily should be granted absent some justification for refusal. Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962).

> The liberal amendment policy underlying Rule 15(a)
> affords the court broad discretion in granting leave to
> amend and, consequently, a motion for leave to amend
> should not be denied unless there is "undue delay, bad
> faith or dilatory motive on the part of the movant,
> repeated failure to cure deficiencies by amendments
> previously allowed [or] undue prejudice to the opposing
> party by virtue of allowance of the amendment, ..."

United States ex rel. Willard v. Humana Health Plan of Tex. Inc., 336 F.3d 375, 386 (5th Cir. 2003) (alteration in original) (citation omitted). Leave to amend also may be denied when amendment would be futile. Id. at 387. An amendment is futile if

14

the amended complaint is subject to dismissal under Rule 12(b)(6)
for failure to state a claim upon which relief could be granted.
Stripling v. Jordan Prod. Co., 234 F.3d 863, 873 (5th Cir. 2000).

Plaintiffs' proposed amended complaint adds no new factual
allegations against Hood; on the contrary, the factual recitation
relating to Attorney General Hood is identical to that set forth
in the original complaint.  Under the heading "Equitable Relief,"
the proposed amended complaint does add allegations that the
alleged constitutional violations are of a "continuous and ongoing
nature," that plaintiffs' "Constitutional rights have been
violated repeatedly" (including "in recent days") and that such
violations are "highly likely to recur."  However, these
allegations, at least as applied to Hood, are entirely conclusory
and thus, contrary to plaintiffs' position, do not correct the
defects in the original complaint.  Beavers v. Metropolitan Life
Ins. Co., 566 F.3d 436, 439 (5th Cir. 2009) ("Any well-pled factual
allegations must be viewed in the light most favorable to the
plaintiffs, but 'conclusory allegations or legal conclusions
masquerading as factual conclusions will not suffice to prevent a
motion to dismiss.'") (quoting Fernandez-Montes v. Allied Pilots
Ass'n, 987 F.2d 278 (5th Cir. 1993)).  That is to say, although
plaintiffs now label defendants' challenged actions as "ongoing"
and "continuing," they have not identified, in fact, an ongoing
constitutional violation by Attorney General Hood.  Plaintiffs'

15

allegations remain insufficient to place their claims within the Ex parte Young exception so as to avoid the bar of Eleventh Amendment immunity on their official capacity claim against Hood.

In addition to the claims against Hood in his official capacity, plaintiffs' proposed amended complaint attempts to set forth federal claims against Hood in his individual capacity for negligent misrepresentation in violation of the First Amendment, violation of 42 U.S.C. § 1981 and violation of their First Amendment rights.  The Eleventh Amendment does not operate as a bar to these claims.  See Crane v. Texas, 759 F.2d 412, 428 n.17 (5th Cir.) ("The Eleventh Amendment is obviously no bar to actions for damages against officials sued in their individual capacities[.]"), cert. denied, 474 U.S. 1020, 106 S. Ct. 570, 88 L. Ed. 2d 555 (1985).  However, in the court's opinion, plaintiffs' proposed amended complaint states no potentially viable claim against Hood.

Plaintiffs' claim against Hood for "negligent misrepresentation" in violation of the First Amendment fails to state a claim as a matter of law.  This claim is necessarily brought under 42 U.S.C. § 1983, as a plaintiff cannot recover against a state official directly under the First Amendment and must instead proceed under § 1983.  See Burns-Toole v. Byrne, 11 F.3d 1270, 1273 n.3 (5th Cir. 1994) (recognizing that § 1983 is the proper vehicle for First Amendment claims against state

16

officials).  And yet it is well settled that negligence is not actionable under 42 U.S.C. § 1983.  March v. Jones, 53 F.3d 707, 712 (5th Cir. 1995) (citing Daniels v. Williams, 474 U.S. 327, 333-35, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986)).

Plaintiffs allege that Hood violated 42 U.S.C. § 1981 when he made statements which "were misleading and/or overly broad so as to effectively discredit Plaintiffs" and thereby interfered with BFAA's lawful "[membership] agreements, membership rights, and association of African Americans."  Their allegation appears to be that by publishing statements that "effectively discredit[ed] plaintiffs," Hood interfered with plaintiffs' ability to contract with prospective members or caused existing members to breach their membership agreements.  Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  The phrase "make and enforce contracts" is defined to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).  To establish a § 1981 claim, the plaintiff must show that (1) he or she is a member of a certain race; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination involved one or more of the activities

17

enumerated in the statute.  See Green v. State Bar of Texas, 27
F.3d 1083, 1086 (5th Cir. 1994).

Among other bases for concluding that no § 1981 claim has or
can be stated, Hood argues that he cannot be personally liable
under § 1981 for interference with plaintiffs' contracts with
members or prospective members of BFAA as he is not a party to
these contracts.  The Fifth Circuit "has declined to define
comprehensively the universe of third parties who can be liable
under § 1981." Miller v. Wachovia Bank, N.A., 541 F. Supp. 2d
858, 861 (N.D. Tex. 2008); see also Felton v. Polles, 315 F.3d
470, 480 (5th Cir. 2002) ("First, it is not clear whether a § 1981
claim lies against an individual defendant not a party to the
contract giving rise to the claim."), abrogated in part on other
grounds, Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53,
126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006); Bellows v. Amoco Oil
Co., 118 F.3d 268, 274 (5th Cir. 1997) ("As a threshold matter, we
observe that this court has not yet decided whether a plaintiff
has a cause of action under § 1981 against a third party for
interference with the plaintiff's right to make and enforce
contracts."). However, it has "suggested that a plaintiff does
not have a cause of action under § 1981 against a third party for
interference with the plaintiff's right to make and enforce
contracts." James v. Parish, 421 Fed. App'x  469, 470, 2011 WL
1378128, 1 (5th Cir. 2011) (citing Felton, 315 F.3d at 480); see

18

also Green, 27 F.3d at 1086-87 (explaining that the plaintiff
failed to state a claim under § 1981 as he did not "complain that
[defendant] refused to contract with him or that [it] somehow
impeded his right to enforce a contract in either the courts or
nonjudicial avenues," but merely alleged "that the defendant
refused to honor a third-party contract he had with his clients").
The only exception the court has recognized is where a state
official or employee, though not a party to the contract at issue,
is "essentially the same" as the State for purposes of the
complained-of conduct and thus is "nominally a party" to the
contract.  In that circumstance, the official may be held
individually liable under § 1981.  See Felton, 315 F.3d at 480-81
(stating "it would appear [plaintiff's supervisor at state agency]
could only be amenable to § 1981 liability if he were "essentially
the same" as the State for purposes of the complained-of conduct")
(emphasis added); Foley v. Univ. of Houston Sys., 355 F.3d 333,
337-38 (5th Cir. 2003) (stating, "We have ... accepted that § 1981
liability will lie against an individual defendant if that
individual is 'essentially the same' as the State for the purposes
of the complained-of conduct"); Faraca v. Clements, 506 F.2d 956,
959 (5th Cir.), cert. denied, 422 U.S. 1006, 95 S. Ct. 2627, 45 L.
Ed. 2d 669 (1975) (holding that director of state entity could be
personally liable under § 1981 for interfering with the
plaintiff's right to contract with the State (refusal to hire

because wife was black)); see also Miller, 541 F. Supp. 2d at 862-63 (discussing evolution of Fifth Circuit jurisprudence on third-party personal liability under § 1981 in employment context, including "the test repeated by the Fifth Circuit that § 1981 liability does not run to an employee unless the employee was 'essentially the same' as the employer in the acts that form the basis of the plaintiff's complaint").

While the Fifth Circuit may not yet have "define[d] comprehensively the universe of third parties who can be liable under § 1981," Miller, 541 F. Supp. 2d at 861, in this court's opinion, the Fifth Circuit would not find potential liability in the circumstances of this case.  Hood is not "nominally a third party" to BFAA's contracts with members and/or prospective members.  Rather, he is a complete stranger to those contracts or prospective contracts.  For this reason, the court concludes that no claim is or can be stated against Hood under § 1981.

Even if a stranger to a contract could be liable under § 1981, there still would be no claim stated here, for plaintiffs have not alleged any facts that would indicate that Hood acted with intent to discriminate against them on the basis of race. For this reason, as well, the court concludes that no claim is stated.  See James, 421 Fed. App'x  at 470 (dismissing claim where plaintiff did not allege any facts that would indicate that the defendant took challenged action because of the plaintiff's race).

20

As the basis for their First Amendment claim, plaintiffs
allege the following:

> Defendants have acted in ways so as to either
> intentionally or negligently interfere with Plaintiff's
> lawful exercise of its first amendment rights or have
> acted in a way so as to preclude or chill the free
> exercise of Plaintiff's first amendment speech and the
> right to peaceably assemble and express their views to
> members and potential members.

The Fifth Circuit has recognized that "[a]s a general rule, the
First Amendment prohibits not only direct limitations on speech
but also adverse government action against an individual because
of her exercise of First Amendment freedoms." Colson v. Grohman,
174 F.3d 498, 508 (5th Cir. 1999).  To establish a First Amendment
retaliation claim, plaintiffs must show that "(1) they were
engaged in constitutionally protected activity, (2) the
defendants' actions caused them to suffer an injury that would
chill a person of ordinary firmness from continuing to engage in
that activity, and (3) the defendants' adverse actions were
substantially motivated against the plaintiffs' exercise of
constitutionally protected conduct." Keenan v. Tejeda, 290 F.3d
252, 258 (5th Cir. 2002).

Focusing first on the second element, Hood argues that
plaintiffs have failed to state a cognizable claim for relief as
they do not allege that the press release prevented them from
speaking, assembling or exercising any other rights that may be
protected by the First Amendment; on the contrary, he notes,

21

plaintiffs have alleged that they have continued these same activities even after the press release.  In response, plaintiffs point out that they have alleged that BFAA's organizational activities have been hampered, and note in particular their allegations that as a result of the press release, some members have requested refunds and some prospective claimants have opted not to join BFAA.

Notwithstanding plaintiffs' conclusory allegation that they were "chilled" in the exercise of their First Amendment rights, the court finds that they have not alleged conduct resulting in an injury that would "chill a person of ordinary firmness from continuing to engage in [protected] activity." Keenan, 290 F.3d at 258.  "Not all retaliatory conduct tends to chill First Amendment activity, and a plaintiff seeking to recover for retaliation must show that the defendant's conduct resulted in something more than a 'de minimis inconvenience' to her exercise of First Amendment rights." O'Neal v. Falcon, 668 F. Supp. 2d 979, 987 (W.D. Tex. 2009) (citations omitted).  "Certainly, some retaliatory actions-even if they actually have the effect of chilling the plaintiff's speech-are too trivial or minor to be actionable as a violation of the First Amendment." Keenan, 290 F.3d at 258.  Recently, in Bailey v. City of Jasper, Tex., the court surveyed cases addressing types of injuries that have been

found both sufficient and insufficient to chill the speech of a

person of ordinary firmness and reported the following:

> Courts have found the following acts sufficiently severe
> to chill the speech of a person of ordinary firmness:
> drawing guns on plaintiffs during a routine traffic stop
> and separately charging plaintiffs with "deadly conduct"
> [Keenan, 290 F.3d at 259]; refusing to grant a land
> permit in violation of local laws [Nestor Colon Medina &
> Sucesores, Inc. v. Custodio, 964 F.2d 32, 40-41 (1st
> Cir. 1992)]; public release of "irrelevant, humiliating,
> and confidential" details of a rape of the plaintiff
> [Bloch v. Ribar, 156 F.3d 673, 681 (6th Cir. 1998)]; and
> arresting plaintiff, handcuffing him, placing him in leg
> irons, and holding him overnight in the coldest cell in
> the jail [Simmons v. City of Mamou, Civ. No. 09-663,
> 2012 WL 912858, at *7 (W.D. La. Mar. 15, 2012)].  On the
> other hand, courts have found the following acts not
> sufficient to chill the speech of a person of ordinary
> firmness: calling the manager of a state office where
> the plaintiff was doing research in order to litigate
> his case against the federal government and encouraging
> the manager to not allow plaintiff to use the office's
> resources for that purpose [Smart v. Holder, 368 Fed.
> App'x 591, 592 (5th Cir. 2010)]; preventing access to
> newsworthy information about a university athletics
> program [Smith v. Plati, 258 F.3d 1167, 1176-77 (10th
> Cir. 2001)]; criticism of a student's speech and
> presentation in a speech class [O'Neal v. Falcon, 668 F.
> Supp. 2d 979, 988 (W.D. Tex. 2009)]; a brief traffic
> stop resulting in a speeding ticket, for which probable
> cause existed [Benson v. McKinney, Civ. No. 07-0672,
> 2009 WL 1033172 (W.D. La. Apr. 16, 2009)]; falsifying a
> police report, refusal to interview witnesses, and
> failure to enforce a temporary restraining order [Doe v.
> County of San Mateo, Nos. C 07-05596 SI, C 08-02541 SI,
> 2009 WL 735149, at *6-7 (N.D. Cal. Mar. 19, 2009)]; and
> failure to investigate plaintiff's criminal complaint
> and failure to enforce a protection order [Walbert v.
> Wichita Police Dept., Civ. No. 10-1234-MLB, 2011 WL
> 2473143 (D. Kan. June 21, 2011)].

Bailey, 112-CV-153, 2012 WL 4969126 (E.D. Tex. Sept. 24, 2012)

*report and recommendation adopted*, 1:12-CV-153, 2012 WL 4970809

(E.D. Tex. Oct. 17, 2012) (allegation that police department

failed to investigate and pursue criminal charges against plaintiff's daughter's assailant held insufficiently severe).  See also Colson, 174 F.3d at 511-14 (defendants' alleged actions in response to plaintiff's criticism of police department held to constitute, at most, a "steady stream of false accusations and vehement criticism that any politician must expect to endure" which would not deter an ordinary politician from continuing to criticize police officials); Izen v. Catalina, 398 F.3d 363, 367 (5th Cir. 2005) ("subjecting an attorney to criminal investigation and prosecution with the substantial motivation of dissuading him from associating with and representing clients opposing the IRS would violate the First Amendment"); Perez v. Tedford, No. SA-13-CV-429-XR, 2013 WL 5740256, at *4 (W.D. Tex. Oct. 22, 2013) (allegation that defendant officer explicitly requested that plaintiff be disciplined by her employer and made implied threats that it would "endanger relations" between the police department and employer if she were not disciplined held sufficiently severe to state claim).

In Suarez Corp. Industries v. McGraw, 202 F.3d 676 (4th Cir. 2000), the court held that when a public official responds to a private citizen's protected speech with his own speech, a claim for retaliation will lie only where the official's speech amounts to a "threat, coercion, or intimidation intimating that

punishment, sanction, or adverse regulatory action will imminently

follow." Id. at 687.  The court explained:

>The nature of the alleged retaliatory acts has
>particular significance where the public official's acts
>are in the form of speech.  Not only is there an
>interest in having public officials fulfill their
>duties, a public official's own First Amendment speech
>rights are implicated.  Thus, where a public official's
>alleged retaliation is in the nature of speech, in the
>absence of a threat, coercion, or intimidation
>intimating that punishment, sanction, or adverse
>regulatory action will imminently follow, such speech
>does not adversely affect a citizen's First Amendment
>rights, even if defamatory. See X-Men Sec., Inc. v.
>Pataki, 196 F.3d 56 (2d Cir. 1999) (to be reported at
>196 F.3d 56) (holding that, in the absence of threats,
>intimidation, or coercion, legislators' "disparaging,
>accusatory, or untrue statements about X-Men fail to
>state a claim for violation of X-Men's constitutional
>rights"); Colson v. Grohman, 174 F.3d 498, 512 (5th Cir.
>1999) (holding that a citizen's First Amendment rights
>were not adversely affected because she had "alleged
>only that she was the victim of criticism, an
>investigation (or an attempt to start one), and false
>accusations: all harms that, while they may chill
>speech, are not actionable under our First Amendment
>retaliation jurisprudence"); Penthouse Int'l Ltd. v.
>Meese, 939 F.2d 1011, 1015-16 (D.C. Cir. 1991) (holding
>that public officials were entitled to qualified
>immunity for criticism they leveled at publishers of
>pornography and noting that "the Supreme Court has never
>found a government abridgment of First Amendment rights
>in the absence of some actual or threatened imposition
>of governmental power or sanction"); R.C. Maxwell Co. v.
>Borough of New Hope, 735 F.2d 85, 89 (3d Cir. 1984)
>(holding that a borough that sent letters to a landowner
>encouraging, but not threatening, intimidating, or
>coercing, the landlord to terminate its leases with a
>billboard owner did not violate the billboard owner's
>First Amendment rights where the landowner terminated
>the leases in order to curry favor with the borough);
>Hammerhead Enters., Inc. v. Brezenoff, 707 F.2d 33,
>38-39 (2d Cir. 1983) (holding that a public official who
>sent letters to retail stores requesting that they
>refrain from selling a controversial board game did not
>violate the board game manufacturer's First Amendment

rights, and declaring that to rise to the level of
conduct that violates free speech rights, a public
official's comments must "reasonably be interpreted as
intimating that some form of punishment or adverse
regulatory action will follow the failure to accede to
the official's request"); Thoma v. Hickel, 947 P.2d 816,
821 (Alaska 1997) (concluding that the First Amendment
protects an official's right to speak truthfully in
response to criticism even if the official's speech is
retaliatory and stating, "We do not believe that
imposing section 1983 liability on a public official who
responds in kind to protected speech critical of the
official would be consistent with the First
Amendment."); cf. Bantam Books, Inc. v. Sullivan, 372
U.S. 58, 68, 83 S. Ct. 631, 9 L. Ed. 2d 584 (1963)
(finding a constitutional violation where a Rhode Island
Commission's conduct amounted to "thinly veiled threats
to institute criminal proceedings" against publishers
who did not make efforts to stop circulating
publications on a list created by the Commission); Gini
v. Las Vegas Metro. Police Dept., 40 F.3d 1041, 1045
(9th Cir. 1994) (holding that defamation must be
accompanied by a harm to "some more tangible interests"
to be actionable retaliation (internal quotations
omitted)).

Id. at 687-88.  See also Perez, 2013 WL 5740256, at 4
(acknowledging that only threatening, coercive or intimidating
speech by public official will constitute actionable retaliation
but finding that official's alleged speech was threatening).

In Suarez, a private citizen, SCI, sued the West Virginia
attorney general and a deputy attorney general for violation of
its First Amendment rights, alleging that, among other things, the
officials had made defamatory statements to the media and other
attorneys general accusing SCI of engaging in a fraudulent
marketing scheme.  The alleged defamatory statements included
assertions that SCI "preys on the elderly, infirmed and

incapacitated," ... "is a gambling syndicate from Ohio that also
sells jewelry," ... "representatives ... have 'a documented
proclivity to violence,'" and ... has "link[s] to organized
crime'" and the further statement that "I think people are tired
of the elderly being victimized like this." Id. at 681, 682.  The
court held that since the defendants' alleged retaliatory acts
were in the nature of speech,

> the interests in conflict are SCI's First Amendment
> right to speech versus [the defendants'] First Amendment
> speech rights, as well as their duty to keep the public
> and other law enforcement officials informed about
> consumer fraud and their ongoing investigation and
> prosecution of SCI.  Because none of [the defendants']
> statements concerned private information about an
> individual, we find that the appropriate inquiry to
> determine whether [the defendants] adversely affected
> SCI's First Amendment speech rights to be whether their
> speech was threatening, coercive, or intimidating so as
> to intimate that punishment, sanction, or adverse
> regulatory action will imminently follow.  See X-Men
> Sec., 196 F.3d 56; Penthouse Int'l, 939 F.2d at 1016;
> Hammerhead Enters., 707 F.2d at 39.

Id. at 689.  The court concluded it was not, stating:

> SCI has failed to show that [the defendants'] statements
> can reasonably be interpreted as intimating that [the
> defendants] would punish, sanction, or take an adverse
> action against SCI.  None of the statements even imply
> that [the defendants] would utilize their governmental
> power to silence SCI.  Thus, SCI has failed to show that
> [the defendants'] alleged defamatory statements to the
> media and other attorneys general adversely affected its
> First Amendment rights.

Id.

That is equally true here.  In the case at bar, plaintiffs do
not allege that they were deterred from exercising their First

Amendment rights.[4]  The question, though, is whether Hood's complained-of conduct – which was purely speech – would have deterred "a person of ordinary firmness" from continuing to conduct meetings and workshops and solicit members.  See Keenan, 290 F.3d at 259.  Most certainly, Hood's press release did not disclose private information about plaintiffs.  Neither did it state or imply that plaintiffs would suffer adverse consequences of any sort if they were to continue their activities.  Rather, it merely warned the public in general, and black farmers/ranchers in particular, to be wary of persons or organizations that would charge them a fee to help them file claims in and/or participate in the Pigford I/Pigford II litigation, since the deadline for filing such claims had long passed.  Not only is there no factual allegation that this had the effect of chilling plaintiffs' First Amendment activities, but in the court's opinion, this would not have dissuaded any "person of ordinary firmness" from such activities.  The court thus concludes that the facts alleged by plaintiffs in the proposed second amended complaint, taken in the

---

[4]     While Fifth Circuit precedent "does not appear to expressly require a showing that a plaintiff's speech has been actually inhibited by the retaliation," Linzy v. Cedar Hill Indep. School Dist., 37 Fed. App'x  90, n.7 (5th Cir. 2002), it does recognize that "any 'chill' of protected rights must be more than 'minimal' and not 'wholly subjective,'"  Johnson v. Rodriguez, 110 F.3d 299, 314 (5th Cir. 1997) (citing United States v. Ramsey, 431 U.S. 606, 622-24, 97 S. Ct. 1972, 52 L. Ed. 2d 617 (1977)).  Again, while plaintiffs recite that they were "chilled," their factual allegations belie this conclusory assertion.

light most favorable to them, do not state a claim for violation of their rights under the First Amendment.

Plaintiffs' proposed second amended complaint purports to set forth their causes of action in separate counts; and there is no count for conspiracy.  However, the proposed pleading recites in paragraph 2 that "defendants in concert with various private and public entities have employed police officers and media and others ... to intentionally subject plaintiffs to ... violations of" their constitutional rights; and in paragraph 10, it states that "[p]rivate corporations named as Defendants and others have conspired and acted in concert with the government actors named as Defendants and others to suppress the First Amendment rights of citizens in favor of reopening the Black Farmer's discrimination litigation...."  Hood argues in response to plaintiffs' motion that to the extent plaintiffs may have attempted to do so, they have failed to state an actionable claim for conspiracy as the complaint does not include "factual detail and particularity" as to how defendants allegedly perpetrated the conspiracy and to meet all the required elements for a conspiracy claim.  As defendant notes, the Fifth Circuit has repeatedly held that "[p]laintiffs who assert conspiracy claims under civil rights statutes must plead the operative facts upon which their claim is based" and that "[b]ald allegations that a conspiracy existed are insufficient."  Knatt v. Hospital Serv. Dist. No. 1, 289 Fed.

App'x 22, 33 (5th Cir. 2008) (quoting <u>Lynch v. Cannatella</u>, 810 F.2d 1363, 1370 (5th Cir. 1987)).  <u>See also Hoffman v. Stulga</u>, 464 Fed. App'x 229, 232 (5th Cir. 2011) ("[N]one of the facts asserted by [plaintiff] show that the defendants conspired and agreed to deprive him of his constitutional rights."); <u>Du Bois v. Warne</u>, 336 Fed. App'x 407, 409 (5th Cir. 2009) ("Although [plaintiff] couches her claims in terms of a conspiracy, her conclusory charges are unsupported by specific factual allegations and are insufficient to state a constitutional violation under § 1983."); <u>Spence v. Hood</u>, 170 Fed. App'x 928, 931 (5th Cir. 2006) (plaintiff's "conclusional allegations of conspiracy are not sufficient to support a claim under § 1983").

Hood further argues in opposition to the motion to amend that "if BFAA argues the Proposed Second Amended Complaint adequately asserts any official capacity or individual capacity § 1983 defamation-based claims against the Attorney General, those federal claims would never pass muster" for one or more of a number of reasons.  However, a review of the proposed amended complaint establishes that plaintiffs have not alleged a claim of defamation, under either federal or state law.  Instead, under the heading "Defamation – Slander/Libel," the complaint merely recites that "Plaintiffs reserves [sic] the right to argue that the Defendant engaged in defamation and/or slander...."  "Reserving the right" to plead a claim is not the same as actually pleading a

claim.  Further, and notably, in response to Hood's motion,

plaintiffs make no argument in support of a defamation claim.[5]

---

[5]     Even if the complaint could be read as attempting to
state a federal claim for defamation, such claim would fail as a
matter of law.  An essential element of a claim of defamation is
the false statement.  See Lyle v. Dedeaux, No. 94-60200, 1994 WL
612506, at *5 (5th Cir. Oct. 24, 1994)("A plaintiff must allege
falsity ... to state a [§ 1983] claim for defamation.").  The
press release contains no untrue statements.  Although plaintiffs
may plan to undertake some effort to reopen the Pigford or Pigford
II litigation, it is an unassailable fact that the court-
established deadline for filing claims in both cases is closed,
and has been for quite some time.  The court would note, too, that
while the press release makes no mention whatsoever of the Love or
Garcia litigation, the deadline for filing administrative claims
in those cases has passed, as well.
     Moreover, as defendant correctly points out, to state a
federal § 1983 defamation-based claim, the plaintiffs must allege
and prove "a stigma plus an infringement of some other interest."
San Jacinto Sav. & Loan v. Kacal, 928 F.2d 697, 701 (5th Cir.
1991).  The "stigma-plus-infringement" test "permits recovery
under § 1983 when a claimant shows that the government, through
defamation, 'sought to remove or significantly alter a life,
liberty, or property interest recognized and protected by state
law or one of the incorporated provisions of the Bill of Rights."
Thinkstream, Inc. v. Adams, 251 Fed. App'x 282, 284, 2007 WL
3013210, 1 (5th Cir. 2007).  "Damage to one's reputation alone,
apart from some more tangible interest such as employment, does
not implicate any 'property' or 'liberty' interest sufficient to
invoke the due process clause."  Thomas v. Kipperman, 846 F.2d
1009, 1010 (5th Cir. 1988).  While the Fifth Circuit has recognized
that "the freedom to operate a legitimate business is a protected
liberty interest[,]" Thinkstream, 251 Fed. App'x at 284 (citation
omitted), it has also held that the "loss of future employment
opportunities does not typically qualify as the kind of 'tangible
interest'" required, id., and further that "the loss of isolated
contracts does not of itself entail a significant impairment to
operating a business" necessary to give rise to a claim, id.
Here, plaintiffs do not allege any facts which would suggest that
Hood's press release has resulted in or will likely result in a
significant impairment to operating their business.  Thus, the
harms they have alleged "do not rise to the level of a significant
alteration of a liberty interest."  Id.

Based on all of the foregoing, the court concludes that plaintiffs' original complaint against Hood in his official capacity is barred by the Eleventh Amendment.  The court further concludes that the proposed second amended complaint does not state any cognizable claim against Hood in his official or individual capacities[6] and that the proposed amendment would be futile as it relates to Hood.  Finally, the court concurs in Hood's assessment that since plaintiffs have no current claims, or cognizable proposed claims against Hood, the sole defendant against whom this action was brought, then after his dismissal, it does not make sense to transform plaintiffs' lawsuit against Hood into a new one against newly proposed defendants over a series of events which bear no apparent relation to the original claim brought against Hood.  Should plaintiffs wish to pursue these claims, they should file such claims as a separate action.

---

[6]     The court notes that Hood has urged the court to decline to exercise supplemental jurisdiction over any state law claims plaintiffs may have alleged, or sought to allege against him in the proposed amended complaint.  From the court's review, it does not appear that plaintiffs have attempted to allege any state law claim against Hood.  Had they done so, the court would decline to exercise supplemental jurisdiction over such claims.  See 28 U.S.C. § 1367(c)(3) (1367(c)(3) (court may decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction."); see also Peters v. City of Biloxi, 57 F. Supp. 2d 366, 379 n.23 (S.D. Miss. 1999) ("When federal claims are disposed of prior to trial, generally the court should decline to exercise pendent, or supplemental, jurisdiction.").

Accordingly, it is ordered that Hood's motion to dismiss is granted and that plaintiffs' motion for leave to amend is denied.

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

SO ORDERED this 10th day of March, 2014.


/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE